**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**JASON A. ADKINS,**

      **Plaintiff,**

**v.**                                                     **Case No.: 3:17-cv-01187**

**NANCY A. BERRYHILL,
Acting Commissioner of the
Social Security Administration,**

      **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Claimant's application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The case is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 9, 10).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's motion for judgment on the pleadings be **DENIED**; that the Commissioner's decision be

1

**AFFIRMED**; and that this case be **DISMISSED** and removed from the docket of the Court.

## I.    Procedural History

Jason A. Adkins ("Claimant") filed an application for SSI benefits on August 3, 2011, alleging a disability onset date of January 1, 1993, (Tr. at 169), due to "learning disability, anxiety, depression, [and] scoliosis." (Tr. at 204). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 69, 77). Consequently, Claimant filed a request for an administrative hearing. The hearing was scheduled and notification was mailed to the Claimant; however, Claimant failed to appear. Because Claimant failed to appear at the hearing or provide a reason for his non-appearance, the Administrative Law Judge dismissed Claimant's case in March 2013. Subsequently, Claimant notified the Social Security Administration that he never received written notice of the first hearing because the notice was mailed to his former address. (Tr. at 125). The Appeals Council ordered that the ALJ's order of dismissal be vacated and the case be remanded for further proceedings. (Tr. at 62). On June 22, 2015, an administrative hearing was held before Maria Hodges, Administrative Law Judge (the "ALJ"). (Tr. at 30-53). By written decision dated July 28, 2015, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 13-22). The ALJ's decision became the final decision of the Commissioner on December 20, 2016, when the Appeals Council denied Claimant's request for review. (Tr. at 1-3).

Claimant timely filed the present civil action seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings. (ECF

Nos. 7, 8). Claimant then filed a Brief in Support of Judgment on the Pleadings. (ECF No. 9). In response, the Commissioner filed a Brief in Support of Defendant's Decision, (ECF No. 10). Therefore, the matter is fully briefed and ready for resolution.

## II.     **Claimant's Background**

Claimant was 36 years old at the time he filed his application for SSI benefits in this matter and 40 years old at the time of the decision.[1] (Tr. at 15, 34, 169). He has an eleventh grade education, communicates in English, and has work experience as a janitor and a general laborer. (Tr. at 34-36, 203, 206).

## III.    **Summary of ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 416.920(b). If the claimant is not engaged in substantial gainful employment, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §

---

[1] At the administrative hearing, Claimant's counsel informed the ALJ that although he did not have access to the old records, Claimant was previously awarded SSI benefits as a disabled child. From 1997 through 2007, Claimant again received SSI benefits; however, those benefits ended when defendant was arrested and jailed for a brief period. (Tr. at 33-34, 306, 399).

416.920(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, under the fourth step the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 416.920(e). After making this determination, the ALJ must ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the fifth and final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 416.920(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. § 416.920a(a). Under this technique, the ALJ first

evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* § 416.920a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in the regulations. *Id.* § 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* § 416.920a(d). A rating of "none" or "mild" in the first three functional areas (limitations on activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation of extended duration) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating of the degree of functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental function. 20 C.F.R. § 416.920a(d)(3). The Regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

*Id.* § 416.920a(e)(4).

In this case, the ALJ confirmed at the first step of the sequential evaluation that Claimant had not engaged in substantial gainful activity since July 18, 2011, the application date. (Tr. 15, Finding No. 1). At the second step of the evaluation, the ALJ determined that Claimant had the following severe impairments: "borderline intellectual functioning; depression; scoliosis; and substance abuse in remission." (*Id.,* Finding No. 2). Under the third inquiry, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 15-17, Finding No. 3). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform medium work as defined in 20 CFR 416.967(c) except he can frequently climb ramps or stairs; occasionally climb ladders, ropes or scaffolds; frequently balance, occasionally stoop, crouch, or crawl. He can understand, remember and carry out simple instructions; occasional interaction with others; no fast paced production rates or strict time limits, little independent judgment required; and occasional changes in a work setting.

(Tr. at 17-21, Finding No. 4). At the fourth step, the ALJ determined that Claimant had no past relevant work. (Tr. 21, Finding, No. 5). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work-related experience, age, and education in combination with his RFC to determine his ability to engage in substantial gainful activity. (Tr. at 21-22, Finding Nos. 6-9). The ALJ considered that (1) Claimant was born in 1975, and was 36 years old, defined as a younger individual age 18-49 on the date the application was filed; (2) he had a limited education and could communicate in English; and (3) transferability of job skills was not an issue because the Claimant did not have any past relevant work. (Tr. at 21, Finding Nos. 6-8). Taking into account these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that existed in significant numbers in the national

economy, including unskilled work as a store laborer or industrial cleaner at the medium exertional level, night cleaner or automatic car wash attendant at the light exertional level, and sorter or final assembler at the sedentary exertional level. (Tr. at 21-22, Finding No. 9). Therefore, the ALJ concluded that Claimant had not been under a disability, as defined in the Social Security Act, since July 18, 2011, the date the application was filed. (Tr. at 22, Finding No. 10).

## IV.   <u>Claimant's Challenges</u>

Claimant argues that the Commissioner's decision is not supported by substantial evidence, because the ALJ did not give proper weight to the consulting psychologist's opinions and disregarded testimony of the vocational expert. Specifically, Claimant asserts that Lisa Tate, M.A., performed a consultative evaluation of Claimant and concluded that he was markedly impaired in judgment. However, the ALJ gave little weight to this finding on the basis that it was inconsistent with the objective evidence. Claimant contends that the ALJ's failure to accept the opinion resulted in a fatally flawed RFC finding, which overlooked the "practical workplace limitations" suffered by Claimant. (ECF No. 9 at 5). In addition, Claimant complains that the ALJ improperly rejected testimony by the vocational expert, who confirmed that Claimant would not be able to engage in gainful activity if he missed two or more days of work per month and was off task twenty percent of the workday.

In response, the Commissioner points to Claimant's longstanding history of substance abuse, arguing that most of his alleged mental problems are related to his opioid use. Moreover, the Commissioner alleges that Claimant was not honest during this evaluation by Ms. Tate; thereby, skewing some of her findings. Finally, the Commissioner asserts that the ALJ appropriately rejected the vocational expert's

testimony regarding missed days of work and being off task, because the hypothetical question that elicited the testimony was not based on the evidence of record.

## V.     Relevant Medical History

The undersigned has reviewed the transcript of proceedings in its entirety, including the medical records in evidence. However, the following summary is limited to those entries most relevant to the issues in dispute.

### A. Treatment Records

On February 12, 2010, Claimant presented to Prestera Centers for Mental Health ("Prestera"), with complaints of depression and suicidal ideations. (Tr. at 286-303). Claimant reported he had been hearing voices for the past six months, but "they went away when he was on meds but when he stopped taking meds they came back." (Tr. at 297). Claimant also complained of mood swings, panic attacks, and depression. He told his therapist that he had slacked "off drugs in the last three months," and "the last heroin was about a month and a half ago." (*Id.*) He also reported that he last took Suboxone and Lortab three to four weeks earlier. Claimant stated he was independent with activities of daily living, taking medication, and maintaining his personal safety; however, he required assistance with maintaining relationships and accessing services. He was previously admitted to Fox Run Hospital at age seventeen or eighteen for three to four months. At age eighteen, Claimant was admitted to River Park Hospital for psychiatric treatment. He also completed a 28-day substance abuse program at Parc West. After completing that program, Claimant continued with outpatient services for three months and did not take narcotics for four to five months. Claimant had taken Paxil and Wellbutrin in the past for depression, and they seemed to provide some assistance with his symptoms. He reported that he completed eleventh grade, but had

to attend learning disabled classes. He had some vocational training, but could not do any heavy lifting. Claimant was employed at one time, but the job only lasted three weeks because he "wasn't fast enough." (Tr. at 300). He found another job and worked for one and one-half months before being laid off for economic reasons. Claimant was assessed with major depressive disorder-recurrent-severe, with psychotic component, and received a Global Assessment of Functioning ("GAF") score of 45.[2] Claimant's sister filed paperwork at this visit for Claimant to be admitted to River Park Hospital for psychiatric treatment.

Claimant returned to Prestera on February 22, 2010, after having been discharged from the hospital with diagnoses of major depressive disorder-recurrent; psychosis disorder, not otherwise specified; polysubustance abuse; and hepatitis C. (Tr. at 372-73). Claimant told Kambiz Soleymani, M.D., that the medication he received while in the hospital worked well for him. He denied having depression, anxiety, or insomnia. Claimant reported that he had been drug free for the past three weeks and denied any craving for drugs. He reported that his drug use began at age 16 and became worse approximately eight years earlier when opiates became his drug of choice. He admitted to using drugs intravenously, which is how he contracted Hepatitis. Claimant reported finishing the eleventh grade, although he had trouble reading and writing. On

---

[2] The Global Assessment of Functioning ("GAF") Scale is a 100-point scale that rates "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," but "do[es] not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic Statistical Manual of Mental Disorders ("DSM")*, Americ. Psych. Assoc, 32 (4th Ed. 2002) ("DSM-IV"). In the past, this tool was regularly used by mental health professionals; however, in the DSM-5, the GAF scale was abandoned, in part due to its "conceptual lack of clarity" and its "questionable psychometrics in routine practice." DSM-5 at p. 16. Americ. Psych. Assoc, 32 (5th Ed. 2013). On the GAF scale, a higher score indicates a less severe impairment. A GAF score of 41-50 indicates serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job).

examination, Claimant made good eye contact, showing mostly goal directed thoughts; however, he did not volunteer information, especially concerning his drug use. Claimant exhibited mild psychomotor retardation. He had deficits in recalling past events, but no impairment in recalling recent events. Claimant exhibited fair insight, judgment, and concentration. His level of intelligence, based on history, appeared to be low or below average. Dr. Soleymani diagnosed Claimant with depressive disorder, not otherwise specified; rule out major depressive disorder with psychotic features; rule out schizoaffective disorder; and opiate, alcohol and THC abuse versus dependence. Claimant received a GAF score of 50. He was prescribed Paxil, Wellbutrin, and Risperdal and was advised to return in three weeks.

Claimant returned to Prestera on March 4, 2010. (Tr. at 304-40). He reported that he continued to smoke cigarettes, did not exercise, and due to scoliosis, could not do any heavy lifting. Claimant had not experienced any medical problems in the last three months, although he was concerned about his health due to his heroin abuse. In fact, Claimant admitted that he had used heroin on this date and continued to use it daily. (Tr. at 308). Claimant stated that although he had "cut back" on his drug use, he had "been using since I left here last time." (Tr. at 305). He also reported that when heroin was not available to him, he used hydrocodone—five pills per day—and his tolerance had increased with years of drug abuse. As of this visit, Claimant had a pending criminal charge involving conspiracy with intent to deliver a controlled substance. (Tr. at 309). Claimant indicated that he received SSI checks until January 2007, when he lost his benefits after being arrested for shoplifting. He added that although he had participated in job training, he could not work because he could not produce a clean drug screen. Claimant stated that he wanted to work, but had problems adjusting to job

requirements, "was a slow learner," and was "going to look into getting [his] SSI back," despite having been denied twice. (Tr. at 306). He conceded that his drug use prevented him from obtaining and keeping a job and further admitted that being sober improved his depression. Nonetheless, he stated that he was not experiencing any psychological or emotional problems at present. (Tr. at 313). Claimant was instructed to attend substance abuse outpatient treatment, begin outpatient therapy, work on coping skills, and remain alcohol and drug free. He was assessed with opioid dependence; sedative dependence-partial remission; and cocaine and cannabis abuse. Claimant continued to maintain a GAF score of 50. (Tr. at 333).

Throughout the rest of March and all of April 2010, Claimant either arrived too late or did not appear at all for scheduled appointments at Prestera. (Tr. at 270-71, 273-78). He did appear on March 10 and reported feeling better since he was drug free and taking his medication. (Tr. at 268). His mental status examination reflected a euthymic mood, broad affect, and normal thought processes and behavior. (Tr. at 269). Claimant also remained well when he returned on March 24, 2010. (tr. at 271-72). However, Prestera closed his case on April 19, 2010, because he missed too many consecutive therapy sessions. (Tr. at 278).

On June 3, 2010, Claimant appeared at Prestera to reestablish care. (Tr. at 341-62). He reported having suicidal ideations and had developed a plan to hang himself. He described having racing thoughts and increased anxiety around others. He had been given a new prescription for psychotropic medications, but had not filled it, because he "hasn't had time." (*Id.*). A self-assessment by Claimant in five domains of psychological functioning resulted in findings of moderate dysfunction in four domains and marked dysfunction in the domain of maladaptive, dangerous and impulsive behaviors, based

largely on his history of suicidal thoughts. (Tr. at 347-50). On June 8, 2010, he explained that he had returned to Prestera because of increased depression and anxiety related to stopping his psychotropic medications. (Tr. at 279). Ten days later, Claimant returned for therapy and discussed his confusing relationships with two women. (Tr. at 282). However, there was nothing remarkable about his behavior, and his thought processes were normal. (Tr. at 282).

On June 29, 2010, Claimant continued to grapple with relationship issues, but his therapist, Mariella Godby, felt that Claimant had good insight and coping skills and was dealing appropriately with stress. (Tr. at 283). Claimant complained of feeling depressed when he returned on July 29, 2010, primarily due to the arrest of his female roommate. (Tr. at 418). However, on August 13, 2010, Claimant was in a pleasant mood and was not distressed in any way. (Tr. at 419). Claimant missed his appointment in September, but in October advised Ms. Godby that he had gotten into a conflict with his ex-girlfriend that resulted in his arrest. (Tr. at 421). He was worried about having to appear in court later that month. Claimant remained concerned about his court appearance on October 22, 2010, and asked about getting enrolled in Prestera's Suboxone program. (Tr. at 422).

On November 22, 2010, Prestera employee, Tara Fowler, B.A., completed a Addiction Severity Index on Claimant, which included an interview. (Tr. at 374-413). Claimant stated that he had no chronic medical problems, other than Hepatitis and musculoskeletal pain. He received no treatment for Hepatitis and took pain medication for his hip, knee, leg, and back pain. (Tr. at 375). Claimant reported never having worked at a fulltime job, because he had received Social Security benefits, which were discontinued for legal reasons. (Tr. at 376). Claimant lived with his grandmother and

relied on odd jobs and food stamps for subsistence. He admitted to using heroin on a daily basis and had a history of four overdoses. (Tr. at 377-78). He reported that it was "not at all important for him to change his living situation to stay clean and sober" and he had no interest in talking with someone about his living situation. (Tr. at 378). To support his drug habit, Claimant shoplifted, was arrested, and spent ten days in jail. (Tr. at 379). With respect to social and family status, Claimant stated that he had five close friends, was divorced, and had a child who lived with him. (Tr. at 380). Claimant had a close relationship with his mother and siblings, but did not interact with his father. Claimant generally got along with neighbors and other significant family members. (Tr. at 381). His primary area of interpersonal conflict was with his mother and sister, who wanted him to get sober.

Claimant reported having depression and anxiety and indicated that he had been hospitalized three times for psychiatric problems. (Tr. at 383). He also reported having trouble with understanding, concentrating, and remembering. Claimant denied having suicidal thoughts at present, but admitted to having them in the past. He appeared stable on the day of the interview with a normal mood and affect. (Tr. at 384). Claimant advised that he had been admitted to River Park Hospital in February and resumed taking psychotropic medications; including Wellbutrin, Vistaril, and Remeron.

Claimant attended five individual therapy appointments with Prestera staff in 2011; missed, cancelled, or was too late for four appointments; and had two others cancelled by the therapist. (Tr. at 424, 439, 440, 443, 444, 445). On January 21, Claimant reported being sober, but was experiencing mood swings. (Tr. at 423). His affect appeared flat. He had normal memory, gait, posture, thought processing, concentration, eye contact, hygiene, and orientation. Claimant was enrolled in the

Suboxone program and attended group therapy as part of that treatment. In February, Claimant reporting continuing on Suboxone, but having suicidal thoughts. (Tr. at 425). He felt his depression medication was beginning to help, although he appeared to have poor insight into his addiction. Otherwise, his memory, gait, posture, thought processing, concentration, eye contact, hygiene, and orientation were normal. Claimant's diagnosis was opioid dependence. (Tr. at 427). In March, Claimant stated that he had smoked marijuana after breaking up with his girlfriend, instead of committing suicide. (Tr. at 438). He continued to receive Suboxone and attend Narcotics Anonymous ("NA") and Alcoholics Anonymous ("AA") meetings. Claimant returned in May, stating that he had been sober and was thinking of ways to improve his relationship with his eight-year-old son. (Tr. at 441). Claimant continued in the Suboxone program. By August, Claimant had submitted to two drug screens that were positive for controlled substances and complained that he could not understand why he would be in trouble for those screens when he was "trying hard" in the program. (Tr. at 442). He also felt victimized by his mother's displeasure with him for smoking in the house and added that he did not always want to spend time with his son.

On September 7, 2011, Claimant was evaluated by Jennifer Russell, a psychologist working under the supervision of Cynthia Clay, a licensed psychologist at Clay and Associates. (Tr. at 569-75). Claimant complained of feeling moderately depressed and anxious. He also indicated that he heard Clay and Associates could refer him to a Suboxone clinic. Claimant described having depression and anxiety for approximately fifteen years and drug dependence for approximately nine years. He reported having been expelled from school in the twelfth grade for truancy and fighting, and he lived in child shelters due to truancy and noncompliance. As for psychiatric treatment, Claimant

stated that he had treated with Prestera sporadically for years and had received substance dependence inpatient treatment at Bellefonte Hospital and Parc West. He currently used Wellbutrin and BuSpar to treat his symptoms and felt the medications were somewhat helpful. On mental status examination, Claimant had an anxious, depressed mood and a flat affect. He was alert and oriented, but displayed guardedness and nervous movements. His intelligence was evaluated as below average and he complained of hallucinations and hopelessness. His thought stream was logical and circumstantial. Claimant had good attention, fair memory, and fair eye contact. His insight and abstract thought were poor, and his speech was somewhat slow with a low volume. Ms. Russell assessed Claimant with a provisional diagnosis of schizoaffective disorder; opioid dependence; cannabis abuse by history; and rule out post-traumatic stress disorder. She also indicated that personality disorders and borderline intellectual functioning needed to be ruled out. Ms. Russell gave Claimant a GAF score of 55.[3] She thought his prognosis was fair to poor, in part because of his long history of substance dependence and failed rehabilitations. She recommended medication management, individual and family counseling, attendance at NA/AA group meetings, and a referral to a Suboxone treatment program at Claimant's request.

On October 29, 2011, Claimant attended an individual medication management session with Dr. Soleymani. (Tr. at 471-72). Claimant's last management session was in August, and he advised Dr. Soleymani that he needed "to go back on my medications." (Tr. at 471). He complained of increased depression since running out of his

_____

[3] GAF scores between 51 and 60 indicate "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 32.

medications, indicating that he had done much better when on Wellbutrin. Claimant reported that he had been discharged from Prestera's Suboxone program for being noncompliant with treatment and abusing drugs, although he denied the latter charge. Dr. Soleymani questioned the honesty of that statement. He observed that Claimant appeared well-groomed, pleasant, and cooperative, with a normal mental status, except for a depressed mood. Dr. Soleymani diagnosed Claimant with opioid dependence; major depressive disorder; generalized anxiety disorder; and poor compliance with treatment. He restarted Claimant's Wellbutrin and BuSpar and counseled him to avoid drugs. Claimant was told that he could start an outpatient program if his drug cravings or symptoms became worse.

Claimant's treatment records pick up almost two years later, on September 25, 2013, when he initiated treatment with Valley Health Care. (Tr. at 772-78). Claimant was assessed by Dr. Sanjay Masilamani and reported a history of opioid abuse and depression. He stated that he had been seeing Dr. Soleymani, but they had a disagreement, and Dr. Soleymani no longer wanted to treat Claimant. Claimant was a self-referral, indicating that he had no primary care physician. He was currently prescribed Suboxone and Neurontin and wanted to restart therapy so that he could receive Wellbutrin, BuSpar, and Remeron.

Claimant reviewed his symptoms of depression and history of substance abuse with Dr. Masilamani. Claimant stated that he used alcohol beginning at age 15; marijuana beginning at age 17; opiates beginning at age 19; and cocaine beginning at age 22. His drug use affected his work and relationships. Claimant denied using any drugs for four or five months and stated that he was currently in a drug treatment program. Claimant related his educational history to Dr. Masilamani and, as part of his social

history, mentioned that he liked to ride mountain bikes and lift weights for fun.

Dr. Masilamani performed a mental status examination, noting that Claimant had fair grooming and was cooperative with good eye contact. He did not appear agitated; his speech was normal in rate, tone and volume; and he denied suicidal ideations or hallucinations. Claimant's mood was euthymic, and his judgment and insight were fair. He had a poor fund of knowledge but his thought processes were logical, linear, and coherent. Dr. Masilamani diagnosed Claimant with major depression, recurrent with psychotic features; opioid dependence; generalized anxiety disorder; borderline intellectual functioning, rule out mental retardation. Dr. Masilamani prescribed Remeron and Vistaril, indicating that he would consider adding Wellbutrin in the future.

Claimant returned to Dr. Masilamani two times in 2013: November 13 and December 11. His mental status examinations were essentially the same and his diagnoses were unchanged. (Tr. at 767-71). Claimant saw Dr. Masilamani on January 13, 2014 and reported that he was using intravenous heroin again. (Tr. at 763-65). Claimant asked to be referred to a Suboxone treatment program. Dr. Masilamani added Wellbutrin to Claimant's medication regimen and discussed referring him to a Suboxone program.

Beginning on January 20, 2014 and continuing through May 18, 2015, Claimant treated with Dr. Zachary Hansen at Valley Health Systems for Suboxone medication management. (Tr. at 591-762). On January 20, Dr. Hansen performed a thorough interview, review of systems, and physical examination of Claimant. He determined that Claimant was an appropriate candidate for Suboxone therapy and began treatment. On every visit with Dr. Hansen thereafter, Claimant denied having depression and anxiety;

indicated that he could concentrate fully, with no difficulty, when he wanted to do so; and had no aches or pains. (Tr. at 591, 594, 596, 599, 601, 604, 607, 610, 613, 616, 619, 622, 625, 628, 631, 634, 637, 640, 642, 644, 647, 650, 656, 659, 662, 664, 667, 670, 673, 675, 678, 681, 684, 687, 690, 692, 695, 698, 701, 704, 707, 710, 713, 715, 718, 721, 723, 726, 728, 730, 733, 735, 737, 740, 743, 745, 748, 751, 754). Notes prepared by Dr. Hansen demonstrate significant improvement in Claimant's condition while on Suboxone therapy. Claimant reported that he was working out and lifting weights at home and at the YMCA, (Tr. at 619, 625, 662, 667, 673, 681, 684, 692); he volunteered at the Salvation Army shoveling snow, (Tr. at 616); enjoyed the holidays with family and friends, (Tr. at 640, 650, 726); went to the Milton Flea Market, (Tr. at 659, 670); began socializing, attending a cookout and taking vacations with his family to Myrtle Beach and Kings Island, (Tr. at 690, 701, 704, 710, 718, 721, 723); started GED classes, (Tr. at 610); got an apartment for himself, (Tr. at 591, 594, 596), and consulted with Vocational Rehabilitation about getting a job, (Tr. at 730).

### B. Evaluations and Opinions

On October 10, 2011, Claimant was interviewed and examined by Lisa Tate, M.A., at the request of the West Virginia Disability Determination Service. (Tr. at 447-51). Ms. Tate observed that Claimant was appropriately groomed, and his hygiene was good. He was able to use all of his limbs and had no apparent hearing or vision problems. His speech production was good with normal rate and volume. He described his primary complaints to be "learning disability, depression, anxiety, and other medical problems." (Tr. at 448). Claimant reported that he had been kicked out of school in the twelfth grade. While in school, he was placed in learning disabled classes. Claimant was currently enrolled in GED classes, but had difficulty in all subject areas. He claimed not

to be able to read and write well enough to complete a job application.

Claimant also reported having depression and anxiety for ten to fifteen years. His condition had worsened over time, and he currently experienced symptoms five to six times per week, which could last for several hours at a time. He stated that he was reluctant to leave his house and was uncomfortable in crowded places. Claimant had symptoms of social withdrawal, feeling down, and loss of interest in activities. Ms. Tate noted from a records review that Claimant had prior diagnoses of anxiety disorder; depressive disorder; borderline intellectual functioning; and was presently in Suboxone treatment at Prestera. He had no recent illnesses, injuries, or hospitalizations and took Wellbutrin and BuSpar. When asked about substance abuse, Claimant denied drinking alcohol or using illicit drugs, and also denied a history of drug/alcohol abuse, treatment, or related arrests. (Tr. at 448). As for work history, Claimant reported working two weeks at the YMCA, but was fired for calling in sick. The longest job he had ever held was as a janitor with Goodwill, and that position ended after six weeks.

Ms. Tate performed a mental status examination and found Claimant to be alert and oriented. His mood was depressed, and his affect was restricted. However, his thought processes were logical and coherent, and his thought content was normal. Claimant stated that he had auditory hallucinations, consisting of two or three male voices telling him that he was stupid and crazy, and urging him to kill himself. Ms. Tate felt Claimant's insight was fair, but his judgment was markedly deficient based on his answer to one question she posed to him. His immediate, recent, and remote memory was normal, as was his concentration. Ms. Tate assessed Claimant with depressive disorder, not otherwise specified, with anxious features, and with a provision diagnosis of borderline intellectual functioning. She explained that her assessment of Claimant's

intellectual functioning assessment was provisional, because it was based entirely upon his previous diagnosis. She documented that Claimant spent his days laying around the house and watching television. He heated meals in the microwave, attended to his hygiene, took out the trash, visited with his friends, and shopped at a tobacco store two to three times per week. Ms. Tate opined that Claimant's social functioning was normal; his pace and concentration were normal; but his persistence was mildly to moderately deficient.

Based upon a records review, Rosemary Smith, Psy.D, completed a Psychiatric Review Technique form on October 24, 2011. (Tr. at 453-66). She found Claimant to have borderline intellectual functioning, depressive disorder, and a substance abuse disorder, although none of the disorders precisely satisfied the diagnostic criteria. Dr. Smith opined that Claimant was mildly limited in activities of daily living; moderately limited in maintaining social functioning, concentration, persistence, or pace; and he had no episodes of decompensation of extended duration. She saw no evidence of paragraph C criteria. Dr. Smith pointed out that Claimant was not credible based upon his denial of substance abuse problems to Ms. Tate and was only partially credible when describing his other mental health symptoms. Dr. Smith's Psychiatric Review Technique form was affirmed by Jeff Boggess, Ph.D., as part of a case review on February 20, 2012. (Tr. at 578). On February 22, 2012, Dr. Boggess reviewed the evaluation performed at Clay and Associates and determined that the evaluation did not alter his prior opinion; therefore, he again affirmed Dr. Smith's review. (Tr. at 579).

Dr. Smith also completed a Mental Residual Functional Capacity Assessment. (Tr. at 467-70). She opined that Claimant was not significantly limited in most activities, with the exception of being moderately limited in the following activities:

understanding, remembering, and carrying out detailed instructions; maintaining attention and concentration for extended periods of time; interacting appropriately with the general public; accepting instructions; and responding appropriately to criticism from supervisors. In regard to Claimant's RFC, Dr. Smith found him to "retain the ability to learn and perform simple, unskilled work-like activities in an environment that involves limited contact with others." (Tr. at 469).

### C. Claimant's Statements

In an Adult Disability Report prepared by Claimant in August 2011, he indicated that he last worked on November 30, 2010 and left employment after being fired for calling in sick. (Tr. at 204). In an Adult Function Report also prepared in August 2011, Claimant stated that he could attend to his daily grooming activities with a little encouragement; could make simple meals; took out the trash; walked; shopped once per week for food; stayed home and watched television as he did not like to go out; and had problems getting along with others. (Tr. at 213-17). Claimant indicated that he had trouble reading, but could follow oral instructions if they were repeated. He did not like changes in routine and had trouble handling stress. (Tr. at 218). Claimant filed a second form regarding his daily functioning in February 2012. (Tr. at 230-36). He stated that his friends helped him fill out the form, because he could not spell well. Claimant described having anxiety, hearing voices, and staying in his home due to his discomfort around other people. He still attended to his own grooming, with some encouragement, but he no longer cooked for himself. (Tr. at 230-31). He no longer did his own shopping and had trouble counting change. Claimant reiterated that he could not read or write well. (Tr. at 232). He also asserted that his back hurt him too much to participate in activities, and he had trouble paying attention. (Tr. at 234).

At the administrative hearing held on June 22, 2015, Claimant testified that he had an eleventh grade education and could read, write, and do simple math "a little bit." (Tr. at 35). To get around, Claimant either relied on his mother to drive him, or he rode a mountain bike. Claimant alleged that, physically, scoliosis affected his ability to work and, mentally, his depression made working difficult. (Tr. at 39). He estimated that he could stand for twenty to thirty minutes before having to sit; he could walk six or seven blocks before needing to rest; had trouble sitting still due to back discomfort; and could lift around fifteen pounds. (*Id.*). Claimant stated that he had been going to Vocational Rehabilitation to assist him with finding employment and was studying for his GED, although he was having trouble with math. (Tr. at 42). Claimant testified that he still became anxious in crowds and preferred to stay home. He continued to hear voices at night, but the voices were not as frequent as they had been in the past. (Tr. at 45). Claimant stated that he lived with his twelve-year-old son, and he saw his mother and sister often. Claimant testified that he received Suboxone therapy through Valley Health and attended four to six NA or AA meetings per week. (Tr. at 46).

## VI.  <u>Standard of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In Blalock v. Richardson, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir.

1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the record and determine whether it is adequate to support the conclusion of the Commissioner. *Hays*, 907 F.2d at 1456. When conducting this review, the Court does not re-weigh evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001) (citing *Hays*, 907 F.2d at 1456)). Moreover, "[t]he fact that the record as a whole might support an inconsistent conclusion is immaterial, for the language of § 205(g) ... requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'" *Blalock*, 483 F.2d at 775 (citations omitted). Thus, the relevant question for the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig*, 76 F.3d at 589).

## VII. <u>Discussion</u>

Claimant's two challenges to the Commissioner's decision are addressed in turn below.

### A. **Weight Given to Opinion of Lisa Tate, M.A.**

Lisa Tate, an examining psychologist, prepared a report on October 17, 2011 assessing Claimant with depressive disorder, with anxious features, and, provisionally, with borderline intellectual functioning. (Tr. at 450). As part of the mental status examination, Ms. Tate found Claimant to have markedly deficient judgment based upon his answer to a question about what he would do if he found a letter that was already addressed and stamped. Claimant replied that he did not know what he would do. (Tr. at 449).

The ALJ reviewed Ms. Tate's report and gave some weight to her findings that Claimant's pace and concentration were normal; his persistence was mildly to moderately deficient; and he was competent to manage money. (Tr. at 20). The ALJ gave less weight to Ms. Tate's conclusions that Claimant had normal social functioning and markedly deficient judgment, indicating that these opinions were not consistent with the other evidence, which showed Claimant to have a greater deficit in social functioning and a lesser deficit in judgment. (*Id.*). To accommodate the functional effects of Claimant's mental impairments, the ALJ incorporated limitations in the RFC finding, stating that: Claimant could understand, remember, and carry out simple instructions; could only have occasional contact with others; could not work in an environment with fast-paced production requirements or strict time limits; could exercise little independent judgment; and could tolerate only occasional changes in the work setting. (Tr. at 17). The function-by-function mental limitations included in the RFC finding essentially mirrored those suggested by Rosemary Smith, Psy.D, whose opinions were given great weight by the ALJ. Dr. Smith had reviewed the case file, including the report of Ms. Tate's examination, and prepared an RFC assessment based on the totality of the evidence. In addition to relying on Dr. Smith's assessment, the ALJ more closely considered the evidence regarding Claimant's judgment. Based on her analysis, the ALJ supplemented Dr. Smith's RFC assessment by further restricting Claimant to work that required little independent judgment.

Notwithstanding the RFC limitation directly addressing Claimant's deficit in judgment, and without further elaboration, Claimant argues that the RFC finding is "fatally flawed." (ECF No. 9 at 5). In Claimant's view, the RFC finding does not adequately address Ms. Tate's opinion regarding judgment and, consequently, fails "to

consider the practical workplace limitations suffered by [Claimant]." The undersigned **FINDS** no merit to Claimant's challenge.

When evaluating a claimant's application for disability benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R. § 404.1527(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* § 404.1527(a)(2).

The regulations outline how the opinions of accepted medical sources should be weighed in determining whether a claimant qualifies for disability benefits. *Id.* § 404.1527(c). For claims filed prior to March 27, 2017 (such as Claimant's), the ALJ should give more weight to the opinion of an examining medical source than to the opinion of a non-examining source, and even greater weight to the opinion of a treating physician, because that physician is usually most able to provide a detailed, longitudinal picture of a claimant's alleged disability. *Id.* § 404.1527(c)(1)-(2). A treating physician's opinion on the nature and severity of an impairment may be afforded controlling weight when the following two conditions are met: (1) the opinion is well-supported by clinical and laboratory diagnostic techniques and (2) the opinion is not inconsistent with other substantial evidence. *Id.* When a treating physician's opinion is not supported by clinical findings, or is inconsistent with other substantial evidence, the ALJ may give the physician's opinion less weight. *Mastro v. Apfel,* 270 F.3d 171, 178 (4th Cir. 2001).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must analyze and weigh all the medical opinions of record,

taking into account the following factors: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. 20 C.F.R. § 404.1527(c)(1)-(6). The ALJ must provide "specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record." Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *5 (S.S.A. Jul. 2, 1996).[4] Generally, the more consistent a physician's opinion is with the record as a whole, the greater the weight an ALJ will assign to it. *Id.* § 404.1527(c)(4); *see, also, Brown v. Comm'r Soc. Sec. Admin.*, 873 F.3d 251, 268 (4th Cir. 2017) (highlighting three factors that could determine the weight of a medical source's opinion and justify a deviation from the treating physician rule: "supportability in the form of a high-quality explanation for the opinion and a significant amount of substantiating evidence, particularly medical signs and laboratory findings; consistency between the opinion and the record as a whole; and specialization in the subject matter of the opinion."). Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays*, 907 F.2d at 1456.

In this case, the ALJ provided a comprehensive review of the objective medical findings, Claimant's statements, his level of activity, and the medical source opinions. The ALJ discussed the strengths and weaknesses of the medical source opinions and explained the weight she assigned to each of them, including the opinions of Lisa Tate. Although the ALJ did not give great weight to all of Ms. Tate's opinions, the ALJ was not

---

[4]Social Security Rulings 96-2p, 96-5p, and 06-3p have been rescinded for claims filed on or after March 27, 2017; therefore, they still apply to this claim. *See* 82 FR 15263-01.

required to do so and was free to accept some of her opinions, while rejecting others. *See, e.g., Laing v. Colvin,* No. SKG–12–2891, 2014 WL 671462, at *10 (D. Md. Feb. 20, 2014) ("Although the ALJ accorded 'great weight' to the state agency psychologists, he was not required to adopt every single opinion set forth in their reports.") (citing *Bruette v. Comm'r Soc. Sec.,* No. SAG–12–1972, 2013 WL 2181192, at *4 (D. Md. May 17, 2013)). Ultimately, the ALJ gave the most weight to medical source opinions that were consistent with and supported by the evidence as a whole. Accordingly the ALJ complied with Social Security rulings and regulations in weighing the medical source opinions.

Significantly, Claimant fails to identify any additional or different limitation that should have been included in the RFC finding to better account for Claimant's lack of judgment. Indeed, although the ALJ concluded that Claimant's impairment in judgment was not quite as severe as determined by Ms. Tate, the ALJ nevertheless acknowledged that Claimant had impaired judgment and accounted for it by limiting him to simple work that required little independent judgment. Such a limitation was consistent with the record as a whole and is supported by substantial evidence.

The record unequivocally demonstrates that Claimant had longstanding problems with substance abuse and depression. When Claimant was using drugs and not taking psychotropic medications, his psychiatric condition deteriorated. (Tr. at 368). On the other hand, when Claimant avoided illicit drugs and regularly took psychotropic medications, his mental status improved. (Tr. at 767, 770, 776). The record indicates that approximately two weeks after Claimant's evaluation by Ms. Tate, he was seen by Dr. Soleymani at Prestera. (Tr. at 471-72). Claimant reported to Dr. Soleymani that he needed "to get back on his medications." (Tr. at 471). According to Dr. Soleymani's note, Claimant had been discharged from Prestera's Suboxone treatment program for using

illicit drugs, had not received medication management for more than two months, had run out of his psychotropic medications, and, as a result, was experiencing an increase in symptoms. Dr. Soleymani also suspected that, despite his current protestations, Claimant was again abusing drugs. (*Id.*). Accordingly, at the time Ms. Tate met with Claimant, he was not receiving treatment and was not taking his prescribed medications.

In contrast, during periods of treatment compliance, Claimant's judgment was assessed as "fair" by his treating psychiatrist. (Tr. at 767, 770, 776). Furthermore, the record clearly shows that when Claimant successfully followed a program of Suboxone therapy and received consistent mental health treatment, his primary treating physician expressed no concerns over Claimant's judgment. To the contrary, Claimant displayed significant functional improvement overall. (Tr. at 591, 594, 596, 599, 601, 604, 607, 610, 613, 616, 619, 622, 625, 628, 631, 634, 637, 640, 642, 644, 647, 650, 656, 659, 662, 664, 667, 670, 673, 675, 678, 681, 684, 687, 690, 692, 695, 698, 701, 704, 707, 710, 713, 715, 718, 721, 723, 726, 728, 730, 733, 735, 737, 740, 743, 745, 748, 751, 754). Accordingly, the undersigned **FINDS** that the ALJ properly weighed the opinions of consulting source, Lisa Tate.

### B. Vocational Expert's Testimony

Claimant complains that the ALJ disregarded testimony by the vocational expert. In particular, Claimant argues that the ALJ should have accepted the vocational expert's opinion, made in response to queries by Claimant's lawyer, that if Claimant missed two or more days per month or was off task twenty percent of the workday, he could not maintain fulltime employment. The undersigned **FINDS** this challenge unpersuasive, because the hypothetical questions posed by Claimant's lawyer did not accurately reflect the ALJ's RFC finding, which was supported by substantial evidence.

In order for a vocational expert's opinion to be relevant, it must be in response to a proper hypothetical question that sets forth all of the claimant's impairments. *Walker v. Bowen*, 889 F.2d 47, 50-51 (4th Cir. 1989); *English v. Shalala*, 10 F.3d 1080, 1085 (4th Cir. 1993). To frame a proper hypothetical question, the ALJ must first translate the claimant's physical and mental impairments into a RFC that is supported by the evidence; one which adequately reflects the limitations imposed by the claimant's impairments. *Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006). "[I]t is the claimant's functional capacity, not his clinical impairments, that the ALJ must relate to the vocational expert." *Fisher v. Barnhart,* 181 F. App'x 359, 364 (4th Cir. 2006). A hypothetical question will be "unimpeachable if it adequately reflects a residual functional capacity for which the ALJ had sufficient evidence." *Id.* (citing *Johnson v. Barnhart,* 434 F.3d 650, 659 (4th Cir. 2005)) (internal quotation marks omitted).

In this case, the ALJ found Claimant capable of doing less than a full range of medium work, paying special attention to his psychological deficits. The ALJ included a number of limitations in the RFC finding that accounted for the functional effects of Claimant's mental impairments. The ALJ posed hypothetical questions to the vocational expert, including a hypothetical question that incorporated all of the limitations contained in the RFC finding. (Tr. at 49-50). Even when assuming these limitations, the vocational expert identified jobs that Claimant was capable of doing at the medium, light, and sedentary exertional level. The ALJ only rejected testimony by the vocational expert that was based upon a hypothetical question that did not accurately reflect the RFC finding. Therefore, the ALJ fulfilled her mandate with respect to the vocational expert's testimony.

Although Claimant couches his challenge in terms of the weight given to the

vocational expert's testimony, this challenge is, in effect, an additional attack on the ALJ's RFC finding. SSR 96-8p provides guidance on how to properly assess a claimant's RFC, which is the claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1. RFC is a measurement of the ***most*** that a claimant can do despite his or her limitations resulting from both severe and non-severe impairments, and the finding is used at steps four and five of the sequential evaluation to determine whether a claimant can still do past relevant work and, if not, whether there is other work that the claimant is capable of performing. *Id.* According to the Ruling, the ALJ's RFC determination requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* at *3. Only by examining specific functional abilities can the ALJ determine (1) whether a claimant can perform past relevant work as it was actually, or is generally, performed; (2) what exertional level is appropriate for the claimant; and (3) whether the claimant "is capable of doing the full range of work contemplated by the exertional level." SSR 96-8p, 1996 WL 374184, at *3.

In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at *7. Further, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* at *7. "Remand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780

F.3d 632, 636 (4th Cir. 2015) (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)) (markings omitted).

However, the scope of "judicial review in social security cases is quite limited." *Smith v. Colvin*, No. 1:14-29870, 2016 WL 1249270, at *1 (S.D.W. Va. Mar. 29, 2016). "When reviewing a Social Security disability determination, a reviewing court must uphold the determination when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence." *Cuffee v. Berryhill*, No. 15-2530, 2017 WL 715070, at *2 (4th Cir. Feb. 23, 2017) (internal citations and markings omitted). Substantial evidence is that which "a reasonable mind might accept as adequate to support a conclusion" and it "consists of more than a mere scintilla of evidence but may be less than a preponderance." *Id.* (citation omitted). Significantly, in reviewing for substantial evidence, the court must not "undertake to reweigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the [ALJ]" and "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [ALJ]." *Id.* Furthermore, the ALJ is solely responsible for assessing a claimant's RFC. 20 C.F.R. § 404.1546(c).

As previously stated, the ALJ in this case performed a thorough assessment of the evidence in arriving at Claimant's RFC. (Tr. at 17-21). She acknowledged that Claimant had psychiatric and substance abuse issues that affected his ability to work, and she outlined an RFC that addressed his function-by-function limitations. The ALJ explained the basis for her findings and made references to evidence exemplifying points of her analysis. A review of the record demonstrates the existence of substantial evidence in support of the RFC finding. Furthermore, the testimony of the vocational expert was

instrumental in the ALJ's decision, and the ALJ fully accepted the expert's testimony to the extent it was based on hypothetical questions that accurately reflected Claimant's RFC finding. Accordingly, the undersigned **FINDS** that the ALJ's hypothetical questions to the vocational expert and the ALJ's decision to disregard testimony based upon hypothetical questions that did not reflect the RFC finding complied with Social Security rules and regulations.

## VIII. <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that Plaintiff's motion for judgment on the pleadings be **DENIED**, (ECF No. 9); Defendant's motion for judgment on the pleadings as articulated in her brief in support of Commissioner's decision be **GRANTED**, (ECF No. 10); the final decision of the Commissioner be **AFFIRMED**, that this action be **DISMISSED**, with prejudice, and removed from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Chambers, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** November 27, 2017

Cheryl A. Eifert
United States Magistrate Judge